

# NUMBER 13-26-00120-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF Z.S., Z.S., M.S. III, CHILDREN

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 2
## OF SAN PATRICIO COUNTY, TEXAS

## MEMORANDUM OPINION

### Before Chief Justice Tijerina and Justices West and Cron
### Memorandum Opinion by Chief Justice Tijerina

Appellants Father and Mother appeal the trial court's order terminating their parental rights to their children "Zoe," "Zillow," and "Max."[1] By two issues, appellants challenge the trial court's findings of statutory grounds for termination and its best-interest findings. We affirm.

---

[1] We refer to appellants as Mother and Father, and to the children and other individuals by aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

# I. BACKGROUND

A bench trial was held on January 15, 2026. At the time of trial, Zoe was eight, Zillow was six, and Max was three.

## A. Heather Matheny Testimony

Heather Matheny testified that she is a caseworker with the Texas Department of Family and Protective Services (Department). On June 12, 2024, the Department received an intake regarding the penetration of Zoe's anus and vagina by her minor cousin. When investigators arrived at Wendy's home (paternal grandmother), they observed unstable living conditions: there was no food available, the home was very unsanitary, there were feces and urine on the floor, plates had rotten food, and there was trash all over the house and floor. There were three adults at this residence and another child, but Father and Mother were not present. On July 18, 2024, the children were removed. All three children tested positive for impetigo. Additionally, Max had two abrasions, diarrhea, and tested positive for Sapo virus and E. coli. Zoe "had multiple abrasions and small injuries to the soles of both of her feet," and "a large[,] healed laceration" on her left foot. The Department's investigation revealed that an adult male that was living in the home with the children tested positive for cocaine, and another child living in the home with the children also tested positive for cocaine.[2] Thus, Matheny stated, "the children were knowingly placed or knowingly allowed to remain in conditions or surroundings which endangered [their] physical and emotional well-being."

The children lived in a foster home from August 27, 2024, until June 26, 2025, when they went to live with Reggie, their maternal grandmother. The children had

---

[2] Zoe, Zillow, and Max were not drug tested.

visitation with Father and Mother at this time. Reggie informed Matheny that the children would return "from visitations" with Mother and Father with flea bites and bed bug bites. Every time the children returned from visitation, they were unruly and defiant. It was hard to get the children back on schedule because they would fight, hit each other, and they would not mind Reggie. According to the children's therapy reports, Zillow "admits to getting in trouble at [Reggie's] house because she keeps being bad because she's crying, screaming, and throwing things." Zoe and Zillow were diagnosed with ADHD, and they "have therapy sessions for decreasing anxiety, feelings of shame, guilt, and irritability." They have been diagnosed with "distress and impairment of functioning as evidenced by anxiety, disruptive behavior, [and] fighting with siblings." They were also diagnosed with oppositional disorder.

During the pendency of the case, the children were allowed overnight visits with Mother and Father in Mother and Father's trailer home. Zoe informed Matheny that her parents still do not take the dogs out to use the restroom, so the children wake up to urine and feces on the floor. Additionally, Zoe informed Matheny that Father urinates himself on the couch every night while he sleeps. Both Zoe and Zillow have gotten wet from sitting on the sofa. When Zillow asked Father about it, he stated, "[W]ell I told you not to sit on the couch because that's where I use the restroom." Matheny testified that she visited the parents' home just the day before, and "there was a very strong urine odor in the home . . . to the point where [her] nose was burning." When Matheny questioned Father about the odor, "he stated that they use bleach to clean." Matheny told Father that the odor was urine, not bleach. Father then told her that they were having "sewage issues."

3

Matheny attempted to visit the home three prior times in December but was unable to gain access to the home. Instead, Mother and Father sent her pictures of the home on December 19, 2024. Matheny stated that she was able to visit the home just yesterday and provided the trial court with pictures of the home, but she was not allowed in the parent's bedroom.

The parents completed their court-ordered services; however, they did not pay any child support for the children during the entire pendency of the proceeding. Father tested positive for marijuana and methamphetamine on August 8, 2024. He tested positive for marijuana on October 15, 2024, November 26, 2024, and December 19, 2025. Mother tested positive for marijuana on August 8, 2024, and November 26, 2024.

On January 5, 2026, just two weeks before trial, Reggie informed Matheny that Zoe stated, "her dad beat her while she was at the visitation." From a picture, Matheny observed "slight discoloration on the left side" of Zoe's buttocks.

While Zillow expressed an interest in returning to her parents, Zoe stated that she would like to have "like a shared custody" between her parents and Reggie. Matheny testified that the children's needs are currently being met, and they are now up to date on their medical appointments and no longer are experiencing any physical medical conditions. When the Department first removed Max, his speech was delayed. However, he is now thriving, attending speech therapy, and "he is talking a lot." Matheny recommended that the Department be named permanent managing conservators of the children and that parental rights be terminated.

## B. Reggie's Testimony

Reggie testified that in November 2024, the children returned from Father and

4

Mother's home and were "physically beating [her]." According to Reggie, the children told her they did not have to live with her, and they did not have to mind anything she said. They were defiant, and "it was really horrible, the things that I went through." For example, Zillow "actually put [Max] underwater in a swimming pool," and "has done really bad things and been very angry," including "pooping herself, peeing herself out of spite." Reggie takes the children food whenever they visit with Mother and Father. Reggie stated that the children attended therapy while they were in her care. However, "they switched [the children's therapy] to the parents, and then it just stopped." On March 5, 2024, Reggie stated that the children told her Father "tied up [Mother] in front of the kids and stabbed her." The children explained that "Mommy got away, Mommy got free."

Reggie stated that prior to the children's removal in 2024, she did not see the children for two years because Mother and Father came into her home and beat her, forcing her to "recuperate for a long time from the beating." Reggie stated that she filed a police report for "home invasion" and for "beating" her. Reggie added that right before the children were removed, Wendy was requesting diapers for the children online because the children were in Wendy's care.

## C. Mother's Testimony

Mother testified that Father has never tied her up and beat her, but they do have "physical altercations" and have completed the court-ordered domestic violence classes. Mother denied that Father assaulted Reggie, stating that she "never witnessed [Father] put a hand on anyone" (other than her). Rather, Mother claimed that Reggie, Mother's brother, and Mother's stepfather beat Mother and caused her to be arrested and treated by EMTs at the jail. Mother stated charges against her from this altercation were

5

dismissed when she completed anger management classes.

Regarding the spanking incident, Mother stated that Zoe "got popped" by Father because Zoe was trying to hit Max.

Mother stated that while she and Father went on "vacation," she "left [her] children with [Wendy] in a motel room in Mathis" for a week. When Mother and Father returned from vacation, Wendy had "moved [the children]." Mother was not sure if Wendy had moved the children to Odem or Mathis because she does not "know where the house was." When Mother was asked why the children were living with Wendy when they were removed, Mother stated, "[t]hey were just kind of with her. They were really not living with us" because she and Father were experiencing "financial trouble," so they left the children with Wendy. Mother agrees that when the children were removed from Wendy's care they were living in "pretty extreme conditions," but now Mother tries "to keep [the] floors clean, the dishes done, [and] trash taken out." While this may not happen every day, it is a goal Mother and Father have.

Mother stated she is currently working at McDonald's and Stripes, and Father is about to start working with her at McDonalds. Although they do not have a vehicle, a family friend provides transportation to and from work. Mother stated that she has not financially supported the children or given Reggie any money for them because "why would [she] pay to have them somewhere [she] did not put them." Mother stated that Father has two other children, and he pays child support for one other child though Father has not seen any of those children in over nine years.

**D.    Father's Testimony**

Father testified that he has a medical disorder, which causes him to void himself

6

while he is sleeping, and that is the reason he urinates on the couch. Father stated he uses diapers and pee pads, but sometimes "the diapers do not get all of it." He has been on medication for five years.

Father testified that he has repaired holes in the walls of his trailer, he is currently working on replacing the flooring in the trailer, and the landlord is fixing an issue with the sewage. The reason why he did not let Matheny go into his trailer is because he worried for Matheny's "safety" due to the flooring, and he did not want Matheny to use that "as a tool against [him]."

Father denied assaulting Reggie. Father testified that Zoe behaves violently with her siblings, so that is why he spanked her.

Father acknowledged that he tested positive for methamphetamine and marijuana; however, he said he addressed those issues in substance abuse counseling. Father stated he was sober up until the positive drug test a month prior to trial, which was "nobody else's fault but [his] own." Father admitted to pleading guilty to an assault causing bodily injury charge in 2016 and burglary of a vehicle.

Father testified that he wishes that the children be returned to him, and he has no issues with the children continuing to have a relationship with Reggie. He stated that he and Mother have not been the best parents, but he knows they can be, and he and Mother are "better now than what [they] have been." Father stated that he is committed to making sure Max attends therapy and that he would like to attend narcotics anonymous classes.

## E. Trial Court's Order

The trial court terminated Mother and Father's parental rights to their children, finding by clear and convincing evidence that they had knowingly placed or knowingly

7

allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being; that they had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and that termination of the parent-child relationship between Mother and Father and the children was in the children's best interest. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (b)(2). Mother and Father appealed.

## II. STANDARD OF REVIEW

A suit involving the potential termination of a parent's right to a child is of constitutional import. *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied). But a parent's rights "are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Striking that balance, a trial court may terminate a parent-child relationship, pursuant to Texas Family Code section 161.001, only if it finds by clear and convincing evidence one predicate ground enumerated in subsection (b)(1) and that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2). Clear and convincing evidence will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When the standard of proof is clear and convincing evidence, an appellate court reviews the legal sufficiency of the evidence and considers "all evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re C.E.*, 687 S.W.3d 304, 308 (Tex.

2024); *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (providing that an appellate court must "view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility, and dealt the closest with the evidence at hand"). "Courts 'must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' but courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Evidence is factually insufficient if in light of the entire record, the disputed evidence contrary to the judgment is so significant that a reasonable factfinder could not have resolved that disputed evidence in favor of the ultimate finding. *In re J.F.C.*, 96 S.W.3d at 266. A core function of the factfinder "is to resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts." *Id.*

### III.   TERMINATION GROUNDS

**A.    Applicable Law**

To terminate parental rights pursuant to subsection (D), the Department must prove by clear and convincing evidence that the parent knowingly placed the child in or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D). "Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). An environment that endangers the child may be created by the physical living conditions in the child's home or by the conduct of a parent living in the

9

home, or both. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *M.R.J.M.*, 280 S.W.3d at 502. A child may therefore be endangered when the home environment creates a potential for emotional or physical injury even where the injurious conduct is not directed at the child and the child does not suffer injury. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Under Texas Family Code section 161.001(b)(1)(E), the Department must show by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). The focus is on the effect of the parent's conduct, which must be the result of a conscious course of conduct rather than a single act or omission. *In re J.T.G.*, 121 S.W.3d 117, 125–26 (Tex. App.—Fort Worth 2003, no pet.). "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *In re R.S.-T.*, 522 S.W.3d at 110; *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[E]ndangering conduct is not limited to actions directed towards the child."). Only one predicate violation under section 161.001(b)(1) is necessary to support a termination order. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## B. Discussion

Mother testified that she and Father left the children in a motel with Wendy when

they were removed from Wendy's care so that Mother and Father could celebrate their anniversary. When Wendy moved the children from a motel to a house, Mother did not "know where the house was" or even whether the house was in "Odem or in Mathis." At the time of removal, the children were suffering from impetigo, abrasions and lacerations, diarrhea, Sapo virus, and E. coli. *See In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.— Beaumont 2004, no pet.) (holding that the children's rotten teeth and developmental delays were a product of avoidable neglect caused by parents knowingly engaging in conduct that endangered their children's emotional or physical well-being); *see also In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *4 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.) (holding, in context of subsections (D) and (E), that the children's untreated medical conditions and developmental conditions supported an endangerment finding). "[N]eglect can be just as dangerous to the well-being of a child as direct physical abuse." *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam). Furthermore, when the children were removed from Wendy, there were three individuals residing in the home that tested positive for cocaine, one of whom was another child. *See In re E.G.*, 643 S.W.3d 236, 253 (Tex. App.—Amarillo 2022, no pet.) (allowing a child to be around persons using drugs can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and qualify as a course of conduct endangering the child's well-being under subsection (E)). Moreover, the children currently suffer from anxiety, distress, impairment in functioning, and unspecified adjustment disorder.[3]

---

[3] The trial court stated: "When a six-year-old poops her pants, it is not out of spite. It is out of trauma. And when she puts her clothes in the wash, it is not out of spite. It is because she is trying to clean up the mess and not get in trouble."

11

It is undisputed that Father tested positive for methamphetamine and marijuana during the pendency of this case, and Father admitted to the dangers of comingling his anti-seizure medication and methamphetamine. "While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial risk of harm." *In re R.R.A.*, 687 S.W.3d at 278. Additionally, Mother tested positive for marijuana at least twice, and Father tested positive again less than one month before trial commenced— even after completing the court-ordered substance abuse program. *See Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.— Houston [1st Dist.] 2006, no pet.) (noting that mother's continued narcotics use after child's removal and in face of drug testing jeopardized her relationship with her child). "[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); *see also In re D.R.*, 631 S.W.3d 826, 835 (Tex. App.—Texarkana 2021, no pet.) (noting that Mother's drug use after completing inpatient treatment "suggested a substantial likelihood that she would be a danger to the children in the future or put them in a possibly harmful situation"). Thus, "a pattern of illegal drug use in such a context is evidence from which a factfinder may infer endangerment." *In re R.R.A.*, 687 S.W.3d at 279.

Mother testified that she and Father have a history of domestic violence though they "are doing better as a couple." *See In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.— Dallas 2011, no pet.) (evidence of domestic violence between the mother and father was

sufficient to establish that mother knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered his physical or emotional well-being); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (providing that a propensity for violence may be considered as evidence of endangerment). Based on this testimony, the factfinder could have "infer[red] a risk of harm from parental conduct that, while not directed toward the child, presents a substantial risk to the child's health and safety." *In re R.R.A.*, 687 S.W.3d at 278.

Mother agreed that she has had at least four to five referrals to the Department prior to this case. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.,* 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see also A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.) (providing that a factfinder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future); *In re Z.T.*, No. 12-18-00078-CV, 2018 WL 4474050, at *7 (Tex. App.—Tyler Sept. 19, 2018, no pet.) (mem. op.) (concluding that mother's long history of Department involvement, alcohol abuse during pregnancy, failure to protect the children from violence, and drug abuse weighed in favor of termination under subsections (D) and (E)). While Mother and Father have made some improvements, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346; *see also In re E.A.*, No. 13-06-503-CV, 2007 WL 2471459, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2007, no pet.) (mem. op.) ("Because there is evidence that appellant's past actions were

13

unsuitable, the trial court could have inferred that similar unsuitable conduct could recur in the future if the children are returned to appellant.").

In *In re R.R.A.*, the Texas Supreme Court stated:

> Appropriate deference to the factfinder assume[s] that the factfinder resolved disputed facts in favor of its finding; a reviewing court can set aside findings only if no reasonable factfinder could form a firm belief or conviction in those findings. Our opinion does not render the clear-and-convincing-evidence standard toothless; instead, it properly defers credibility determinations to factfinders at the trial court level, who most closely interact with the witnesses.

687 S.W.3d at 279. Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the evidence is sufficient to support the trial court's findings that Mother and Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger them and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers them. *See* TEX. FAM. CODE ANN. § 161.001 (b)(1)(D), (E). Moreover, we conclude that the evidence is such that a factfinder could reasonably form "a firm belief or conviction about the truth" regarding the Department's allegations. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Mother and Father's first issue.

## IV.    BEST INTEREST

Mother and Father argue that there is insufficient evidence to support the trial court's finding that termination of their parental rights is in the children's best interest.

### A.    Applicable Law

In determining the child's best interest, the factfinder considers the *Holley* factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the

parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are non-exclusive, and the best interest finding does not require proof of any unique set of factors. *See In re J.J.C.*, 302 S.W.3d 436, 447 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Stability and permanence are paramount in the upbringing of children. *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent, and the burden is on the Department to rebut that presumption. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

## B.    Discussion

### (1)    the desires of the children

Zoe stated that she would like to have shared access between Mother, Father, and Reggie while Zillow would like to remain with Mother and Father. Zoe was "very sad" to leave Reggie's home because "she was very adamant she did not want to leave her school . . . because [she] has [her] friends there." However,

> [a]lthough a child's love of his natural parents is a very important consideration in determining the best interests of the child, it cannot override or outweigh the overwhelming and undisputed evidence showing that the parents placed or allowed the child to remain in conditions, and engaged in conduct or placed the child with persons who engaged in conduct, which endangers the physical and emotional well-being of the child. The child's love of his parents cannot compensate for the lack of an opportunity to grow

up in a normal and safe way equipped to live a normal, productive, and satisfying life.

*In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.). The trial court could have considered evidence that the children were endangered in Mother's and Father's care and that any bond they shared with the children was outweighed by the danger Mother and Father posed. *See id.*

**(2)** **the present and future physical and emotional needs of the children and (3) the present and future emotional and physical danger to the children**

First, Mother testified that she left the children in a motel room with Wendy while she and Father "were away on a vacation." Then Mother testified that the children were "removed" from Wendy because they were "living with her." Mother clarified that the children were living with Wendy at that time because Mother and Father were "no longer allowed to be in the RV park" for "financial reasons." Regardless of whether Mother and Father dropped them off to go on vacation or whether the children were living with Wendy, Mother confirmed that despite her financial trouble, she took a "week-long vacation to celebrate [her] anniversary" because "it was supposed to be us time." *See In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A parent's inability to provide adequate care for her children, unstable lifestyle . . . lack of parenting skills, and poor judgment may be considered when looking at the children's best interest."). There was evidence that the children were suffering from medical conditions at the time of removal. *See In re J.C.D.Y.*, No. 01-23-00713-CV, 2024 WL 1334334, at *28 (Tex. App.— Houston [1st Dist.] Mar. 29, 2024, pet. denied) (mem. op.) ("This evidence that Mother neglected her children's personal hygiene also supports the trial court's best interest findings."); *In re Z.G.*, No. 11-11-00078-CV, 2012 WL 745090, at *4 (Tex. App.—Eastland

16

Mar. 8, 2012, no pet.) (mem. op.) (finding that the parent was unable to provide safe environment for children where the children's hygiene was poor).

Moreover, Mother agreed that the children were living in "extreme" rancid conditions at the time of their removal. *See In re M.C.*, 917 S.W.2d at 270 (finding a parent endangered the children by allowing them to live in extraordinarily unsanitary conditions, which included the presence of garbage, animal feces, and roach infestation)*; see also In re S.L.G.*, No. 11-23-00120-CV, 2023 WL 6883452, at *4 (Tex. App.—Eastland Oct. 19, 2023, no pet.) (mem. op.) ("[E]xposing children to unsanitary living conditions endangers their physical and emotional well-being."). Aside from the day prior to trial, Matheny testified that the last time she was able to visit the home was October 29, 2025, and Father admitted to being uncooperative with the Department in December 2025 and did not allow the Department to perform an inspection of the home. The trial court could have inferred that if Father refused to allow Matheny into his trailer for safety concerns, those same safety concerns presented a risk of harm to the children, thereby making the home unsuitable for the children. *See In re L.L., L.L., and L.L.*, No. 13-24-00137-CV, 2024 WL 3448029, at *9 (Tex. App.—Corpus Christi–Edinburg July 18, 2024, no pet.) (mem. op.) (allowing a child to remain in filthy, uninhabitable home is relevant under these factors); *In re S.L.G.*, 2023 WL 6883452, at *4 ("[T]he evidence shows that Appellant engaged in conduct that endangered the children by physically abusing them, neglecting their medical needs, and exposing them to continuous, unsanitary, and deplorable living conditions."); *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *13 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (finding that the children living in

deplorable conditions in an unsanitary home with rancid odors is not in their best interest).

Father testified that in 2023, he was transitioning out of corporeal punishment because he was resorting to it "too often." *In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *20 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.) ("A child's exposure to violence in the home undermines the safety of the home environment and is relevant when considering the best interest of the child."). However, just two weeks before trial, Zoe complained that Father "beat" her, and Matheny was able to see the discoloration on Zoe's buttocks from a picture. A parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for a child. *See In re C.H.*, 89 S.W.3d at 28; *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases."). There was also evidence that the children's physical conditions have improved during the case, including Max's speech. The trial court could have determined that Mother and Father are unable to provide for the children's physical and emotional needs in the future. *See In re S.Y.*, No. 07-23-00206-CV, 2023 WL 5209104, at *2 (Tex. App.—Amarillo Aug. 14, 2023, no pet.) (mem. op.).

Lastly, Father testified that he had been sober for a little over a year, but he "got caught up in the moment" when he tested positive again one month before termination proceedings. This evidence concerning Father's recurrent drug use also supports the finding that Father poses a present and future risk of danger to the children's emotional and physical wellbeing. *See In re D.R.*, 631 S.W.3d at 835 ("Mother's use of methamphetamine during the pendency of the case, even after being released from

18

inpatient treatment, showed that she lacked the parental abilities necessary to care for the children, that she failed to learn from the programs available to assist her, and that the existing parent-child relationship was not a proper one.").

**(4)** **the parental abilities of the persons seeking custody and (5) the programs available to assist those persons seeking custody in promoting the best interest of the children**

Reggie testified that she was the one dropping off the children and picking them up from visitation with their parents. Mother and Father did not own a vehicle. Thus, the parents did not have reliable transportation and relied on Reggie to see the children. Reggie also testified that when the children were visiting the parents, Reggie was providing them with food and "whatever else they might need," so that the children would be fed. The trial court also viewed a picture of the parents' empty refrigerator following a visit from Matheny. Thus, Mother and Father were still not able to provide the children with food, and this demonstrates a lack of understanding of the children's basic needs. *See* TEX. FAM. CODE § 263.307(b)(12)(A) (considering whether parent demonstrates adequate parenting skills, including providing adequate health and nutritional care, in determining whether parent able to provide child with safe environment); *In re Z.G.*, No. 11-11-00078-CV, 2012 WL 745090, at *4 (Tex. App.—Eastland Mar. 8, 2012, no pet.) (mem. op.) (providing that the parent was unable to provide safe environment for children where home contained "no edible food").

Matheny attempted to visit the home several times in December to no avail. Instead, the parents informed her they were "working,"[4] were at "Walmart," or in "Beeville." On one occasion, the parents informed Matheny they would be home around 3:00 p.m.,

---

[4] Father and Mother repeatedly testified that although Father works for a home health agency, Father currently does not have any clients and had none in December.

19

but when Matheny arrived at the trailer at 5:30p.m., the parents were not home and informed her they would not be home until 7:30p.m. The fact that the parents informed the Department that their home was unavailable for inspection because they were at Walmart and their failure to allow Matheny the opportunity to inspect their trailer shows a lack of initiative and cooperation with the Department. *See* TEX. FAM. CODE § 263.307(b)(10) (stating that willingness and ability "to cooperate with and facilitate an appropriate agency's close supervision" is relevant consideration in deciding whether parent can provide child with safe environment); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Stability is important in a child's emotional and physical development.").

Mother admitted that she has had about four or five referrals to CPS regarding allegations of abuse and neglect, which calls into question Mother's and Father's abilities to parent the children. Although Mother denied that she and children were living in a tent outside Wendy's trailer in the RV park, the factfinder was free to disbelieve her. The factfinder "may infer that past conduct endangering the well[-]being of a child may recur in the future if the child is returned to the parent." *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet. denied).

**(6)    the plans for the children by the individuals or agency seeking custody and (7) the stability of the home or proposed placement**

There was evidence that the children were placed in four different placements in a period of two years. Reggie testified that the children's therapy "stopped," not on her end, but "[t]hey went ahead and switched it to the parents, and then it just stopped."

Mother testified that although she and Father do not have a vehicle, they have a "family friend that's close enough to give [them] rides," and that is how Mother and Father

20

would be able to get to and from the children's appointments and activities. Mother stated that she is "just waiting for income tax to have a decent down payment to get a vehicle." *See In re T.G.R.-M.*, 404 S.W.3d at 17.

### (8)   any excuse for the parent's acts or omissions

Methany testified the odor of urine in the home was so strong, her nose was burning, yet father denied the odor was urine and stated that Methany was smelling bleach. Also, three dogs and two cats live inside the trailer home, and there was evidence that Mother and Father did not take out the animals to urinate and defecate. Thus, the children were exposed to urine and feces on a recurring basis. *See* TEX. FAM. CODE § 263.307(a); *see also In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (providing that a parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs). Mother stated that she did not provide financial support for the children because "why would [she] pay to have them somewhere [she] did not put them," reflecting Mother's lack of understanding of the children's basic needs. *See Holly*, 544 S.W.2d at 372 (providing that the failure to financially support the children "is one of the factors that is to be considered in ascertaining the best interest of the child"); *see also* TEX. FAM. CODE § 263.307(b)(12)(D) (considering whether parent demonstrates adequate parenting skills in the best interest finding).

Based on the foregoing, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother and Father's parental rights was in the children's best interest. We overrule Mother and Father's second issue.

## V.    CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
21st day of May, 2026.